UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| GENE F. OSBURN, Individually and on behalf of All Others Similarly Situated, | X : : Civil Action No. |
| Plaintiff, | : **04  11750 REK** |
| vs. | : : |
| FLEETBOSTON FINANCIAL CORPORATION, COLUMBIA MANAGEMENT GROUP, INC., COLUMBIA MANAGEMENT ADVISORS, INC., COLUMBIA WANGER ASSET MANAGEMENT, L.P., COLUMBIA FUNDS DISTRIBUTOR, INC., CHARLES P. McQUAID, RALPH WANGER, MARGARET EISEN, LEO A. GUTHART, JEROME KAHN, JR., STEVEN KAPLAN, DAVID C. KLEINMAN, ALLAN B. MUCHIN, ROBERT R. NASON, JOHN A. WING and JOHN DOES 1-100 | : : **CLASS ACTION COMPLAINT** : **FOR EXCESSIVE FEES IN** : **VIOLATION OF SECTIONS 34(b),** : **36(b) AND 48(a) OF THE** : **INVESTMENT COMPANY ACT** : **AND SECTIONS 206 AND 215 OF** : **THE INVESTMENT ADVISERS** : **ACT, AND FOR BREACHES OF** : **FIDUCIARY DUTY** |
| Defendants. | : |
| COLUMBIA ACORN FUND, COLUMBIA ACORN SELECT, COLUMBIA ACORN USA, COLUMBIA ASSET ALLOCATION FUND, COLUMBIA BALANCED FUND, COLUMBIA COMMON STOCK FUND, COLUMBIA DISCIPLINED VALUE FUND, COLUMBIA DIVIDEND INCOME FUND, COLUMBIA GROWTH & INCOME FUND, COLUMBIA GROWTH FUND, COLUMBIA GROWTH STOCK FUND, COLUMBIA LARGE CAP CORE FUND, COLUMBIA LARGE CAP GROWTH FUND, COLUMBIA LARGE COMPANY INDEX FUND, COLUMBIA LIBERTY FUND, COLUMBIA MID CAP GROWTH FUND, COLUMBIA MID CAP VALUE FUND, COLUMBIA REAL ESTATE EQUITY FUND, COLUMBIA SMALL AP FUND, COLUMBIA SMALL CAP VALUE FUND, COLUMBIA SMALL COMPANY EQUITY FUND, COLUMBIA SMALL | : : : : **JURY TRIAL DEMANDED** : : : : : : : : : : : : : : : |

MAGISTRATE JUDGE Bowler

RECEIPT #_____
AMOUNT $ 150
SUMMONS ISSUED ✓es
LOCAL RULE 4.1____
WAIVER FORM____
MCF ISSUED____
BY DPTY. CLK ____
DATE 8/10/04

**[Caption Continues On Next Page]**

F:\COLUMBI2\CMPLTOSB.WPD

COMPANY INDEX FUND, COLUMBIA          :
STRATEGIC INVESTOR FUND, COLUMBIA     :
TAX-MANAGED AGGRESSIVE GROWTH         :
FUND, COLUMBIA TAX-MANAGED GROWTH     :
FUND, COLUMBIA TAX-MANAGED GROWTH     :
FUND II, COLUMBIA TAX-MANAGED VALUE   :
FUND, COLUMBIA TECHNOLOGY FUND,       :
COLUMBIA THERMOSTAT FUND, COLUMBIA    :
UTILITIES FUND, COLUMBIA YOUNG        :
INVESTOR FUND, COLUMBIA ACORN         :
INTERNATIONAL FUND, COLUMBIA ACORN    :
INTERNATIONAL SELECT FUND, COLUMBIA   :
EUROPE FUND, COLUMBIA GLOBAL EQUITY   :
FUND, COLUMBIA INTERNATIONAL EQUITY   :
FUND, COLUMBIA INTERNATIONAL STOCK    :
FUND, COLUMBIA NEWPORT ASIA PACIFIC   :
FUND, COLUMBIA NEWPORT JAPAN          :
OPPORTUNITIES FUND, COLUMBIA NEWPORT  :
GREATER CHINA FUND, COLUMBIA          :
NEWPORT TIGER FUND, COLUMBIA          :
CONTRARIAN INCOME FUND, COLUMBIA      :
CORPORATE BOND FUND, COLUMBIA         :
FEDERAL SECURITIES FUND, COLUMBIA     :
FIXED INCOME SECURITIES FUND,         :
COLUMBIA FIXED INCOME SECURITIES      :
FUND, COLUMBIA FLOATING RATE          :
ADVANTAGE FUND, COLUMBIA FLOATING     :
RATE FUND, COLUMBIA HIGH YIELD        :
OPPORTUNITY FUND, COLUMBIA INCOME     :
FUND, COLUMBIA INTERMEDIATE BOND      :
FUND, COLUMBIA INTERMEDIATE           :
GOVERNMENT INCOME FUND, COLUMBIA      :
MONEY MARKET FUND, MONEY MARKET       :
FUND, COLUMBIA NATIONAL MUNICIPAL     :
BOND FUND, COLUMBIA QUALITY PLUS      :
BOND FUND, COLUMBIA SHORT-TERM BOND   :
FUND, COLUMBIA STRATEGIC INCOME FUND, :
COLUMBIA US TREASURY INDEX FUND,      :
COLUMBIA CALIFORNIA TAX-EXEMPT FUND,  :
COLUMBIA CONNECTICUT INTERMEDIATE     :
MUNICIPAL BOND, COLUMBIA CONNECTICUT  :
TAX-EXEMPT FUND, COLUMBIA FLORIDA     :
**[Caption Continues On Next Page]**   :

F:\COLUMBI2\CMPLTOSB.WPD

2

| | |
|---|---|
| INTERMEDIATE MUNICIPAL BOND FUND, | : |
| COLUMBIA HIGH YIELD MUNICIPAL FUND, | : |
| COLUMBIA INTERMEDIATE TAX-EXEMPT | : |
| BOND FUND, COLUMBIA MANAGED | |
| MUNICIPAL FUND, COLUMBIA | : |
| MASSACHUSETTS INTERMEDIATE | : |
| MUNICIPAL BOND FUND, COLUMBIA | : |
| MASSACHUSETTS TAX-EXEMPT FUND, | : |
| COLUMBIA MUNICIPAL BOND FUND, | : |
| COLUMBIA NEW JERSEY INTERMEDIATE | : |
| MUNICIPAL BOND FUND, COLUMBIA NEW | : |
| YORK INTERMEDIATE MUNICIPAL BOND | : |
| FUND, COLUMBIA NEW YORK TAX-EXEMPT | : |
| FUND, COLUMBIA OREGON MUNICIPAL | |
| BOND FUND, COLUMBIA PENNSYLVANIA | : |
| INTERMEDIATE MUNICIPAL BOND FUND, | : |
| COLUMBIA RHODE ISLAND INTERMEDIATE | : |
| MUNICIPAL BOND FUND, COLUMBIA TAX- | : |
| EXEMPT FUND, COLUMBIA TAX-EXEMPT | |
| INSURED FUND, COLUMBIA SMALL CAP | : |
| GROWTH FUND, COLUMBIA EUROPEAN | : |
| THEMATIC EQUITY FUND, COLUMBIA | |
| GLOBAL THEMATIC EQUITY FUND, | : |
| COLUMBIA DAILY INCOME COMPANY FUND, | : |
| (collectively, the "Columbia Funds'), | |
| | : |
| Nominal Defendants. | : |
| _____ | X |

Plaintiff, by and through his counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports and advisories, press releases media reports, news articles, academic literature, and academic studies. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

F:\COLUMBI2\CMPLTOSB.WPD

3

## NATURE OF THE ACTION

1. Plaintiff brings this action on behalf of investors in mutual funds belonging to FleetBoston Financial Corporation ("FleetBoston") which includes the Columbia Funds (referred to collectively herein as the "Columbia Funds"), and derivatively on behalf of the Columbia Funds, against the Columbia Funds investment advisers, their corporate parents and the Columbia Funds directors.

2. This complaint alleges that the Investment Advisor Defendants (as defined herein) drew upon the assets of the Columbia Funds to pay brokers to aggressively push Columbia Funds over other funds, and that the Investment Adviser Defendants concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, through payable from fund assets, are not disclosed to investors in the Columbia Funds public filings or elsewhere.

3. Thus Columbia Funds investors were thus induced to purchase Columbia Funds by brokers who received undisclosed payments from the Investment Advisor Defendants to push Columbia Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in one or more of the Columbia Funds, Columbia Funds investors were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push Columbia Funds to yet other brokerage clients.

4. The Investment Adviser Defendants were motivated to make these secret payments to finance the improper marketing of Columbia Funds because their fees were calculated as a percentage of funds under management and, therefore, tended to increase as the number of Columbia Funds investors grew. The Investment Adviser Defendants attempted to

justify this conduct on the ground that, by increasing the Columbia Funds assets, they were creating economies of scale that insured to the benefit of investors but, in truth and in fact, Columbia Funds investors received none of the benefits of these purported economies of scale. Rather, fees and costs associated with the Columbia Funds were excessive during the Class Period (as defined herein), in large part because the Investment Adviser Defendants continued to skim from the Columbia Funds to finance their ongoing marketing campaign. The Columbia Funds Directors, who purported to be Columbia Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur.

5.  By engaging in this conduct, the Investment Adviser Defendants, and the defendant entities that control them, breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Sections 206 of the Investment Advisers Act (the "Investment Advisers Act"), breached their common law fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to their clients. The Investment Adviser Defendants also violated Section 34(b) of the Investment Company Act because, to further their improper course of conduct, they made untrue statements of material fact in fund registration statements, and material omissions, with respect to the procedure for determining the amount of fees payable to Investment Adviser Defendants and with respect to the improper uses to which the fees were put. Additionally, the Columbia Funds Directors breached their common law fiduciary duties to the Columbia Funds investors by knowingly or recklessly allowing the improper conduct alleged herein to occur and harm Columbia Funds investors.

6.  On January 28, 2004, the *Los Angeles Times* published an article about a Senate

committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the panel, comparing the scandal-plagued industry to "a $7-trillion trough" exploited by fund managers, brokers, and other insiders.

## JURISDICTION AND VENUE

7. The claims, asserted herein arise under and pursuant to Sections 34(b), 36(b) and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15, and common law.

8. This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. § 80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14; and 28 U.S.C. § 1391(b).

9. Many of the acts charged herein, including the creation and utilization of improper revenue sharing agreements, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Additionally, defendant FleetBoston maintains its principal offices in this judicial district.

10. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11. Plaintiff purchased during the Class Period and continues to own shares or units of the Liberty Acorn Fund (n/k/a Columbia Acorn Fund)[1] has been damaged by the conduct alleged herein.

12. Defendant FleetBoston is a financial services company and the ultimate parent of defendants bearing the Columbia name. FleetBoston maintains its corporate headquarters at 100 Federal Street, Boston, Massachusetts 02110.

13. Defendant Columbia Management Group, Inc. ("Columbia Group"), is a wholly owned subsidiary of FleetBoston, is the asset management arm of FleetBoston. Through its member firms, including Columbia Management Advisors, Inc. and Columbia Wanger Asset Management, L.P. ("Columbia Wanger'), Columbia Group offers asset management services and financial products. Columbia Group is located at One Financial Center, Boston, MA 02111-2621.

14. Defendant Columbia Management Advisors, Inc. ("Columbia Management") a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Wanger, managed and advised the Columbia Funds during the Class Period. Columbia Management, along with Columbia Wanger, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Management is headquartered at 100 Federal Street, Boston, Massachusetts 02110.

---

[1] In September 2003, the Columbia Management Group decided to rename all of the funds in its fund family (including the Liberty Acorn Funds) using the Columbia brand and to drop the Liberty brand. Liberty Acorn Fund was renamed to Columbia Acorn Fund.

F:\COLUMBI2\CMPLTOSB.WPD

15. Defendant Columbia Wanger, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Management, managed and advised the Columbia Funds during the Class Period. Columbia Wanger, along with Columbia Management, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Wanger is headquartered at 227 West Monroe, Suite 3000, Chicago, Illinois 60606.

16. Defendant Columbia Management and Columbia Wanger are collectively referred to as the "Investment Adviser Defendants."

17. Defendants Columbia Funds Distributors, Inc. ("Columbia Distributors"), a subsidiary of FleetBoston and a registered broker-dealer, is the distributor of Columbia Funds. In this capacity, Columbia Distributors was responsible for underwriting, sponsoring and retailing the Columbia Funds. Columbia Distributors, a Massachusetts corporation, maintains its headquarters at One Financial Center, Boston, Massachusetts 02111.

18. Defendants Charles P. McQuaid ("McQuaid"), Ralph Wanger ("Wanger"), Margaret Eisen ("Eisen"), Leo A. Guthart ("Guthart"), Irving B. Jerome Kahn, Jr. ("Kahn"), Steven Kaplan ("Kaplan"), David C. Kleinman ("Kleinman"), Allan B. Muchin ("Muchin"), Robert R. Nason ("Nason"), and John A. Wing ("Wing") were Trustees, Directors and/or officers of the Columbia Funds during the Class Period and are collectively referred to herein as the "Director Defendants." For the purposes of their service as trustees, directors and/or officers of the Columbia Funds, the business address for the trustees, directors and/or officers of the Trust is Columbia Wanger Asset Management, L.P., 227 West Monroe Street, Suite 3000, Chicago,

F:\COLUMBI2\CMPLTOSB.WPD

Illinois 60606.

19.     During the Class Period, McQuaid served as a Trustee of the Funds. He is responsible for overseeing 6 portfolios in the Fund complex. McQuaid is deemed an interested person because of his affiliation with the Investment Adviser, namely, his position as Senior Vice President of Wanger Advisors Trust.

20.     During the Class Period, Wanger served as a Trustee of the Funds. He is responsible for overseeing 10 portfolios in the Fund complex. Wanger is deemed an interested person because of his affiliation with the Investment Adviser, namely, his position as President of Wanger Advisors Trust.

21.     During the Class Period, Eisen, for her services as a Director, received compensation totaling $28,125.00 for the fiscal year ended December 31, 2002. She is responsible for overseeing 6 portfolios in the Fund complex.

22.     During the Class Period, Guthart, for his services as a Director, received compensation totaling $40,750.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

23.     During the Class Period, Kahn, for his services as a Director, received compensation totaling $48,000.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

24.     During the Class Period, Kaplan, for his services as a Director, received compensation totaling $45,750.00 for the fiscal year ended December 31, 2002. She is responsible for overseeing 6 portfolios in the Fund complex.

25.     During the Class Period, Kleinman, for his services as a Director, received

compensation totaling $48,250.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

26. During the Class Period, Muchin, for his services as a Director, received compensation totaling $46,000.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

27. During the Class Period, Nason, for his services as a Director, received compensation totaling $90,000.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

28. During the Class Period, Wing, for his services as a Director, received compensation totaling $25,625.00 for the fiscal year ended December 31, 2002. He is responsible for overseeing 6 portfolios in the Fund complex.

29. Defendant John Does 1-100 were Columbia Directors and/or Officers during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of plaintiff's counsel's ongoing investigation.

30. Nominal defendants, the Columbia Funds, as identified in the caption of this complaint and on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of Directors charged with representing the interest of the shareholders in one or a series of the funds. The Columbia Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensible parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased, redeemed, held shares or like interests in any of the Columbia Funds between August 2, 1999 and March 22, 2004, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Columbia Funds, Columbia Distributors and Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation.

35. Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the Investment Company Act was violated by defendants' acts as alleged herein;

    b.    whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

    c.    whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

    d.    whether statements made by defendants to the investment public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Columbia Funds; and

    e.    to what extent the members of the Class have sustained damage and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Director Defendants Breached Their Fiduciary Duties
### To Columbia Funds Investors

37. The defendants' public filings state that the Boards of Directors for the Columbia Funds are responsible for the management and supervision of the Columbia Funds. In this regard, the Statement of Additional Information dated May 1, 2003 for funds offered by the Liberty Acorn Trust (the "Statement of Additional Information"), which includes the Columbia Acorn Fund, which is available to the investor upon request is typical of the Statements of Additional Information available for other Columbia Funds. It states: "The board of Trustees has overall management responsibility for the Funds."

38. Moreover, the Statement of Additional Information states, with respect to the duties of the Directors, as follows:

> The board of Trustees serve indefinite terms of unlimited duration provided that a majority of Trustees always has been elected by shareholders. The Trustees appoint their own successors, provided that at least two-thirds of the Trustees, after such appointment, have been elected by shareholders. Shareholders may remove a Trustee, with or without cause, upon the vote of two-thirds of Acorn's outstanding shares at any meeting called for that purpose. A Trustee may be removed with or without cause upon the vote of a majority of the Trustees.

39. The Statement of Additional Information also sets forth in greater detail the purported process by which the investment managers are selected:

> At a meeting of the board of Trustees held on August 15, 2001, called in part for the purpose of voting on the approval of new Advisory Agreements with Liberty WAM that were substantially identical to the previous Advisory Agreements, the new Advisory Agreements were approved through July 31, 2003 by the unanimous vote of the "non-interested" Trustees of the Trust

voting separately. ***The Trustees considered information about, among other things: (1) Liberty WAM and its respective personnel, resources and investment process; (2) the terms of the new Advisory Agreements; (3) the nature and quality of services provided by Liberty WAM; (4) the investment performance of each Fund and of similar funds managed by other advisors; (5) the profitability to Liberty WAM of its relationship with the Funds; (6) fall-out benefits from that relationship; (7) compensation payable by the Funs to affiliates of the Adviser for other services; (8) economies of sale; and (9) comparable fees and expense ratios.*** The Trustees also considered the terms of an agreement between the Trust and Fleet National Bank (the "Fleet Agreement") in which Fleet agreed that during the initial term of the new Advisory Agreements, except as otherwise authorized by the Trustees, it would: (1) preserve the autonomy of the Trust; (2) preserve the independence of Liberty WAM, including its investment philosophy and approach to investment operations, research and talent; (3) allow Liberty WAM considerable latitude to recruit and compensate (on competitive terms) investment management personnel; (4) not interfere with Liberty WAM's relationships with regional brokers unless regulatory or compliance concerns dictate and permit Liberty WAM to continue to allocate the commissions and soft dollar payments as it has in the past; (5) maintain the trading desk at Liberty WAM for domestic and international trading activities; and (6) not add to the current management responsibilities of any portfolio manager of a Fund the responsibility to manage additional funds from the Fleet organization without the consent of the Trustees.

[Emphasis added.]

40.     The Investment Company Institute ("ICI"), of which Columbia is a member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders'

interests.

> *Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.*
>
> *In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.* [Emphasis added.][2]

41. In truth and in fact, the Columbia Funds Boards of Directors, *i.e.*, were captive to and controlled by the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Columbia Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming Columbia Funds assets. In many cases, key Columbia Funds Directors, were employees or former employees of the Investment Adviser Defendants and were beholden for their positions, not to Columbia Funds investors, but, rather, to the Investment Adviser Defendants, whom they were supposed to oversee. The Director Defendants served for indefinite terms at the pleasure of Investment Adviser Defendant and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (comprised largely of investors' college and retirement savings).

---

[2] The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members have 86-6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excepted from a paper entitled *Understanding the Role of Mutual Fund Directors*, available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

42.     To ensure that the Directors were complaint, the Investment Adviser Defendants often recruited key fund Directors from the ranks of investment adviser companies.

43.     In exchange for creating and managing the Columbia Funds, including the Columbia Acorn Fund, the Investment Adviser Defendants charged the Columbia Funds a variety of fees, each of which was calculated as a percentage of assets under management. Hence, the more money invested in the funds, the greater the fees paid to Investment Adviser Defendants. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Director Defendants' dependence on the investment management company, and its failure to properly manage the investment advisers, millions of dollars in Columbia Funds assets were transferred through fees payable from Columbia Funds assets to the Investment Adviser Defendants that were of no benefit to fund investors.

44.     These practices proved enormously profitable for Columbia Group and Fleet Boston as the expense of plaintiff and other members of the Class who had invested in the Columbia Funds. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . [f]or the most part, customers do not enjoy the benefits of the economics of scale created by having larger funds. ***Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true – once a fund becomes too large it loses the ability to trade in and out of positions without***

> *hurting its investors.* [...]
>
> ***The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%.*** . . . Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never."

[Emphasis added.]

45. Plaintiff and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using so-called 12b-1 fees, Soft Dollars (as defined below) and commissions to improperly siphon assets from the funds.

### Rule 12b-1 Marketing Fees Were Used For Improper Purposes By the Investment Adviser Defendants

46. Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions require that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and evaluate, and any person who is a

party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination, of whether the plan should be implemented or continued." The directors may continue to plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) (15 U.S.C. 80a-35(a) and (b)) of the Act that *there is a reasonable likelihood that the plan will benefit the company and its shareholders*. [Emphasis added.]

47.     The exceptions to the Section 12b prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Director Defendants authorized, and the Investment Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

48.     However, the purported Rule 12b-1 fees charged to Columbia Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Columbia Funds investors. Rather, Columbia Funds management and other fees increased and this was a red flag that the Director Defendants knowingly or recklessly disregarded. If anything, the Columbia Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size

correlated with reduced liquidity and fund performance. If the Director Defendants reviewed written reports of the amounts expended pursuant to the Columbia Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required — which seems highly unlikely under the circumstances set forth herein — the Director Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing Columbia Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Columbia Funds investors.

49. Moreover, at least thirteen Columbia Funds were closed to new investors (the "Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been used to market and distribute them. Nevertheless, the Investment Adviser Defendants received Rule 12b-1 fees charged to the Closed Funds. The Closed Funds that charged such Rule 12b-1 fees are the D Class of: the Columbia Short Term Bond Fund, Columbia National Municipal Bond Fund, Columbia Oregon Municipal Bond Fund, Columbia Fixed Income Securities Fund, Columbia High Yield Fund, Columbia Balanced Fund, Columbia Common Stock Fund, Columbia Growth Fund, Columbia International Stock Fund, Columbia Mid-Cap Growth Fund, Columbia Real Estate Equity Fund, Columbia Strategic Growth Investor Fund, and Columbia Technology Fund.

50. As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excess commissions, that were not disclosed or authorized by the Columbia Funds Rule 12b-1 plan.

F:\COLUMBI2\CMPLTOSB.WPD

### The Investment Adviser Defendants Charged Their Overhead To Columbia Funds Investors And Secretly Paid Excessive Commissions To Brokers To Steer Clients To Columbia's Funds

51. Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commission may properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined *in good faith* that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

52. The Investment Adviser Defendants' actions are not protected by the Section 28(e) safe harbor. The Investment Adviser Defendants used Soft Dollars to pay overhead costs (for items such as computer hardware and software) thus charging Columbia Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment

F:\COLUMBI2\CMPLTOSB.WPD